

40 WEST 57th STREET, 22nd FLOOR
NEW YORK, NY 10019
TEL 212 315-7200  FAX 212 315-3602

June 10, 2010

Mr. David Moson
Garrison Investment Group LP
Managing Director
1350 Avenue of Americas, 9th Floor
New York, NY 10019

**Re: 101 West 87th Street, New York, New York and known as Park Columbus (aka Columbus Green)**

Dear David:

      The purpose of this letter is to describe the terms and conditions under which Eastdil Secured, L.L.C. (the "Broker") is authorized to arrange the sale of the property located at 101 West 87th Street, New York, New York and known as Park Columbus (aka Columbus Green) (the "Property") on behalf of YL West 87 Street LLC (the "Owner"). For the purposes of this agreement the term sale shall include a disposition of the entire Property, a portion of the Property, and/or a partial interest in the Property. Broker understands that the Property currently is the subject of a case filed under title 11 of the United States Code (the "Bankruptcy Code"), which is being administered in the United States Bankruptcy Court in the Southern District of New York (the "Bankruptcy Court") under Case No. 09-16786, and Broker's engagement as an ordinary course professional hereunder will be subject to approval of the Bankruptcy Court ("Engagement Approval").

      **1.**   **Grant**. Upon Engagement Approval, Broker shall have the exclusive right to sell the Property for a period commencing on the date hereof and continuing through and including November 30, 2010 (the "Exclusive Period").

      If the Owner should enter into a written agreement for the sale of the Property before the termination of the Exclusive Period, but the closing does not occur until after the termination of such period, Broker shall be entitled to be paid the compensation in accordance with the terms of this agreement whenever the closing occurs.

      If the Owner sells the Property to a party with whom Broker dealt during the Exclusive Period and a closing of the sale with such party, or any affiliate or subsidiary thereof, takes place within 6 months after the termination of the Exclusive Period, Broker shall be entitled to the compensation provided for in this agreement. The provisions of this paragraph shall in no way be deemed to limit Broker's right in the previous paragraph.

      **2.**   **Compensation**. Owner acknowledges that it has marketed the Property for some time and has met or talked with many significant entities that would be interested in

*497060.5*

acquiring the Property. Accordingly, Owner agrees to pay Broker, and Broker agrees to accept from Owner, compensation in an amount equal to 1.50% (150bps) of the gross sale price of the Property including, without limitation, any cash consideration paid or payable in connection with a sale, the then outstanding principal balances of any debt assumed, or taken subject to, by the purchaser, the face amount of any seller financing provided by the Owner and the fair market value of all other consideration payable in connection with the sale of the Property, without deduction for closing expenses, adjustments or costs of any kind, provided in no event will the compensation to be paid to Broker exceed $500,000. Said compensation shall be earned by and payable to Broker as, if and when the closing of the sale occurs. Broker understands that the sale of the Property will be subject to approval of the Bankruptcy Court and may be subject to an auction conducted by the Bankruptcy Court, subject to any higher or better offer that may be made by a qualified participant. In such event Broker shall be entitled to its compensation whether or not the sale is ultimately made to the entity introduced by the Broker.

Notwithstanding anything contained herein to the contrary, if a sale of the Property should not close due to the Owner's willful default in any of its obligations under any contract that may be signed for the sale of the Property during the Exclusive Period, Broker shall be entitled to the compensation set forth in this agreement on the date of such default, provided that Broker would have been entitled to receive the compensation provided in this agreement if the sale of the Property had actually closed on such date.

Broker shall also be entitled to the compensation set forth in this agreement if the Owner elects to enter into an exchange, assignment or other transfer option ("Alternative Transaction"), so long as a purchase offer or offer to enter into an Alternative Transaction was accepted by the Owner prior to the end of the Exclusive Period.

3. **Expenses**. In all events, Broker shall be entitled to reimbursement for its reasonable out-of-pocket expenses, including, but not limited to, all reasonable costs incurred in the preparation of marketing materials (e.g., photography, cartography, graphic arts, reproductions, printing, etc.) provided, however, that Owner shall have no obligation to reimburse Broker for that portion of any such expenses that is in excess of $20,000, unless such excess is attributable to unforeseen events or circumstances or events or circumstances beyond the control of Broker. Included within such reimbursement will be amounts to cover the costs to be incurred in connection with Broker's internal graphic design and production of marketing materials for the Property, and to cover the cost to maintain a "virtual war" room for the Property. Owner shall promptly reimburse Broker from time to time for any such expenses incurred upon Owner's receipt of an invoice from Broker which invoice shall be sent (i) following preparation of marketing materials and (ii) either upon consummation of a closing of the sale of the Property or upon expiration of the Exclusive Period. To the extent that the Owner requests Broker to provide due diligence materials to prospective purchasers, Owner will directly pay, or reimburse Broker, for all costs incurred in copying and distributing said material within twenty days of receipt of the invoice. These costs are in addition to any other costs incurred by Broker and not subject to the "cap" on any expenses set forth above, provided, however, that Broker shall fully document the costs and if they exceed $50,000.00, separate Bankruptcy Court approval will be required prior to making any payment in excess thereof. If Owner requests changes be made in the marketing materials, or that the overall marketing plan is changed after final approval of said material by the Owner and production of the materials commences, any

costs incurred in making such changes shall be paid directly, or reimbursed to Broker, by Owner, subject to the provisions of the preceding sentence. These costs are in addition to any other costs incurred by Broker and not subject to the "cap" on any expenses set forth above. All requests for expense reimbursement must nbe dealt with in accordance with the Compensation Order approved by the Bankruptcy Court on Aptil 6, 2010.

4. **Information**. The Owner shall make available to Broker the documents and other information which in the reasonable judgment of Broker are necessary or appropriate for the fulfillment of its assignment hereunder and the proper marketing of the Property. All documents and information supplied to Broker by the Owner shall, to the best of the Owner's knowledge, be complete and accurate and the Owner shall correct any information which it learns is incomplete or inaccurate. The Owner may designate certain information as confidential, and Broker will so treat such information. The Owner understands that the information provided to Broker may be used in the preparation of marketing materials that will be distributed to prospective purchasers. The Owner will be asked to approve all marketing materials in advance of their use. The Owner acknowledges and agrees that, as between Broker and the Owner, the Owner is responsible for the accuracy and completeness of all information regarding the Property that is provided by or at the direction of the Owner.

5. **Analysis**. To the extent that Broker prepares any analysis, valuation, appraisal or other report ("Analysis") regarding the economic value of the Property or Owner's interest therein, Owner acknowledges and agrees that any such Analysis will be an estimate only and will not constitute a representation, warranty, covenant or guaranty, either expressed or implied, regarding future events or performance. The Owner represents that the Analysis will be used for its internal purposes only, and will not be disseminated to any third party without the written consent of Broker.

6. **Reporting**. Broker shall keep the Owner current as to the progress of its marketing efforts and the Owner shall refer promptly to Broker all inquiries concerning the Property. To the extent that Owner fails to refer any such inquiry to Broker, or prevents or requests Broker to refrain from contacting, or delivering a marketing brochure to any such party, such party shall be deemed to be a party with whom Broker dealt for all purposes of this agreement. The Owner shall provide Broker, within 15 days of executing this agreement, a list of the names of all parties with whom the Owner had discussed the sale of the Property prior to the date hereof.

7. **Owner's Authority**. The Owner, in its sole discretion, reserves its right to accept or reject any offer for the acquisition of the Property and Broker shall not be due any compensation.

8. **Purchaser Representation**. Owner acknowledges and agrees that the potential purchaser of the Property may request Broker to act as its financial advisor to arrange financing for the purchase of the Property. Owner agrees that Broker may assist such purchaser in arranging financing to complete the acquisition of the Property and that Broker may be paid a fee by such purchaser for arranging any such financing and such fee shall in no event reduce, or be credited against, any fee payable hereunder.

9. **Limitations**. The Owner also understands that Broker will not advise it as to the legal or tax effects of any transaction, and that the Owner should, if it has not done so already, promptly engage legal and tax professionals to advise it as to all such matters during the course of this engagement and any transaction that may result. Broker shall also have no obligation to investigate conditions on or the condition of the Property. The Broker shall, however, make reasonable efforts to determine the financial stability or capability of any prospective purchaser, provided Broker shall have no liability if any such prospective purchaser fails to close. In addition, the Owner should engage technical staff and other analytical personnel to advise and assist it in each of these areas.

10. **Assignment**. Neither party shall assign this agreement or any right or obligation hereunder without the prior written consent of the other party and any such assignment shall be subject to the approval of the Bankruptcy Court.

11. **Claims or Disputes**. Any claim or dispute arising out of or in any way relating to this agreement or its alleged breach shall be determined by the Bankruptcy Court where the Owner's chapter 11 case is pending. The parties may seek, from the Bankruptcy Court, provisional remedies or injunctive relief in support of their respective rights and remedies hereunder. However, the merits of the action that involves such provisional remedies or injunctive relief, including without limitation, the terms of any permanent injunction, shall be determined by the Bankruptcy Court under this section.

12. **Miscellaneous**. The party executing this agreement on behalf of the Owner represents and warrants that, subject to the approval of the Bankruptcy Court, he is duly authorized to bind the Owner with respect to the terms and conditions of this agreement. The party executing this agreement on behalf Broker represents and warrants that he is duly authorized to bind the Broker with respect to the terms and conditions of this agreement.

This agreement contains the entire agreement of the parties hereto and replaces any prior agreements or understandings with respect to the subject matter hereof. It may not be changed, amended or modified except by an instrument in writing signed by the parties hereto.

Provided the terms and conditions of this agreement meet with your approval, please evidence your agreement by executing this letter on behalf of the Owner, and return it to me.

Sincerely,

EASTDIL SECURED, L.L.C.

By: _____
Name: Adam J. Spies
Title: Senior Managing Director

**AGREED AND ACCEPTED:**

YL West 87 Street LLC

By: _____
Name: **JULIAN WELDON**
Title: **VICE PRESIDENT**

Dated: _____