UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK
----------------------------------------------------------x
In re:

**YL WEST 87th STREET, LLC,**　　　　　　　　Chapter 11
　　　　　　　　　　　　　　　　　　　　　　　　Case No. 09-16786 (AJG)

　　　　　　　Debtor.
----------------------------------------------------------x

**MOTION FOR ORDER (A) APPROVING THE TERMS FOR SUBMISSION OF COMPETING OFFERS, THE BIDDING PROCEDURES, THE FORM OF THE PROPOSED CONTRACT OF SALE, AND THE FORM OF NOTICE OF THE ENTRY OF THE PREFIXED ORDER AND; (B) SETTING THE AUCTION SALE DATE; (C) APPROVING PROCEDURES FOR RESOLUTION OF OBJECTIONS TO ASSUMPTION AND ASSIGNMENT OF EXECUTORY CONTRACTS; (D) AUTHORIZING THE SALE OF ASSETS AND ASSIGNMENT OF EXECUTORY CONTRACTS PURSUANT TO 11 U.S.C. §§363 AND 365; AND (E) GRANTING RELATED RELIEF**

TO:　THE HONORABLE ARTHUR J. GONZALEZ,
　　　UNITED STATES BANKRUPTCY JUDGE:

YL West 87th Street, LLC (the "Debtor"), by its undersigned counsel, respectfully represents as follows:

### I. SUMMARY OF RELIEF REQUESTED

1.　By this motion (the "Motion"), the Debtor seeks approval of, among other things (a) the sale by the Debtor of its real estate assets consisting of the land and building located at 101 West 87th Street, New York, New York (the "Real Property") and related assets including furniture fixtures and equipment ("FF&E") together with all leases, tenancies and certain agreements related thereto (the "Leases") and the collective bargaining agreement (the "CBA"and together with the Leases, collectively, the "Executory Contracts") between the Debtor and Local 32BJ of the Service Employees International Union CTW, CLC (the "Union") (hereinafter the Real Property, the FF&E, the Executory Contracts shall be collectively referred to as the "Assets") to 101W 87 LLC (the "Buyer" ) pursuant to the terms of a contract of sale (the "Contract"), a copy of which is annexed hereto as Exhibit "C", that has been negotiated

48544/0001-7071181v2

among the Debtor, the Buyer and Garrison Residential Funding LLC, the Debtor's secured lender ("Garrison"), or such other party (the "Successful Bidder") that may submit a higher and/or otherwise better offer for the Assets at the auction sale to be held, free and clear of all liens, claims, interests and encumbrances pursuant to Sections 105(a) and 363(b), (f), (m), 365, 503(b) and 507 of Chapter 11 of Title 11 of the United States Code (the "Bankruptcy Code"), Bankruptcy Rules 2002, 6004 and 9014 and General Order 383 issued by this Court and (b) other related relief as set forth below.

2. The Debtor has determined that a prompt sale of the Assets is essential and necessary in order to maximize the value thereof for the Debtor's estate and that a sale of the property will maximize the recovery to creditors. The Debtor believes that the terms and conditions of the proposed Contract are fair and equitable and that any delay in consummating the sale of the Assets may result in the loss of Buyer as a potential buyer. The Debtor submits that the proposed sale is in the best interest of the Debtor's estate and should be approved by the Court.

3. The Debtor also seeks more immediate ancillary relief. First, Debtor requests that the Court approve the prefixed Order Scheduling Hearing ("OSH"), which also approves the proposed notice of entry of the OSH, Exhibit "B" hereto, and provides that service of the approved OSH, this Motion, and its Exhibits be provided to the members of the official creditors' committee (the "Committee"), counsel to the Committee, counsel to Garrison and counsel to the Buyer, as well as the Core Group as defined in the Case Management Order approved by the Court on April 23, 2010 and other interested persons and potential bidders. Second, Debtor requests that the Court approve the proposed bid procedures, terms, and conditions for the submission of competing offers for the Assets, Exhibit "A" hereto, the approval of which is also contained in the OSH.

4. The Debtor has reviewed the prefixed OSH with counsel to the Committee which has consented to its entry on the face thereof. Committee counsel has reviewed and approved the proposed bid procedures and has reviewed the Contract, the forms of which are approved by the OSH. The OSH approves the various documents and schedules the auction sale and hearing that will ultimately approve the sale.

## II. CASE BACKGROUND

5. On November 13, 2009 (the "Petition Date") the Debtor filed a voluntary petition for relief under Chapter 11, of the Bankruptcy Code and has continued to operate and manage its business as debtor-in-possession under §§1107 and 1108 of the Bankruptcy Code. No trustee or examiner has been appointed in these cases.

6. The office of the United States Trustee has appointed the Committee, which has retained Tarter, Krinksky & Drogin, LLP as its counsel by order dated June 30, 2010 *nun pro tunic* as at June 4, 2010. No trustee or examiner has been appointed herein.

7. The Debtor's former parent company, YL West 87th Holdings I LLC ("Holdings"), filed a chapter 11 case on September 9, 2009 to obtain the automatic stay of §362 of the Bankruptcy Code to enjoin Holding's mezzanine lender, Garrison Special Opportunities Fund LP from concluding a UCC foreclosure sale of the membership interest of the Debtor.

8. By Motion dated September 14, 2009, Garrison Special Opportunities Fund LP sought relief from the automatic stay in the Holdings chapter 11 case which was granted by the Court in its opinion entered January 13, 2010. Thereafter, on March 15, 2010 Garrison Special Opportunities Fund LP transferred all of Holdings' right, title and interest in the Debtor's membership interest to Garrison Residential Funding II LLC ("Garrison II"), an affiliate of Garrison, which is now the sole member of the Debtor.

9. By Order dated April 6, 2010, the Debtor was authorized to retain the firm of Marilyn Simon & Associates ("Simon") as its Bankruptcy Counsel *nun pro tunic* as at March 17, 2010. The Debtor determined that it would not make financial sense to expend the additional funds required to update and build additional space on the building and its land, and has determined to sell the Assets under a Plan of Liquidation (the "Plan"). Accordingly, by Order entered June 17, 2010, the Debtor retained the firm of Eastdil Secured, L.L.C. ("Eastdil"), to market and sell the Assets.

10. Eastdil sent notice of the proposed sale of the Assets to 393 entities that purchase and develop properties of the type and nature of the Assets and might have an interest in acquiring the Assets (the "Eastdil Notice"). A copy of the Eastdil Notice is annexed hereto as Exhibit "D". Of the entities approached, 103 signed confidentiality agreements and received copies of the offering plan. Thirty-six (36) of those entities actually visited the real estate and toured the premises and 19 of them made bids for the Assets. Eastdil met and negotiated with each entity. Eastdil recommended the Buyer because it was not only a well financed entity, but also offered the highest price for the Assets and was willing to be a stalking horse bidder in an auction sale to be conducted by the Bankruptcy Court.

11. The Debtor believes that the sale of the Assets is in the best interests of the estate and its creditors and will result in the greatest possible recovery to the Debtor's estate.

12. Shortly after its retention, Debtor's counsel obtained entry of an Order to Show Cause signed April 12, 2010 against the Debtor's former counsel and Yair Levy, the Debtor's former principal, directing said entities to turn over the books and records of the Debtor to Simon. Although the records are not fully complete, Simon has in its possession all of the books and records that were delivered.

# III. SUMMARY OF THE CONTRACT[1]

13. **Consideration for the Assets**

At closing, the Debtor will transfer all of its, right, title and interest to the Assets to Buyer in accordance with the Contract and the order approving the Sale of the Assets to the Buyer in accordance therewith ("Sale Order"). Pursuant to the Contract annexed hereto as "C", the consideration (the "Purchase Price") to be delivered in exchange for the Assets will be $48,000,000. If the proposed sale is approved, it is anticipated that the closing will be held at 10:00 a.m. on the date which is the fifth business day following the date upon which the order approving the sale becomes a final order. In addition, upon execution of the Contract, the Buyer will tender a 10% deposit in the sum of $4,800,000, to be held in escrow by Simon pending the conclusion of the auction sale. The funds have been delivered to Simon and are being held in the Firm's trust account. If the Buyer is the successful bidder, the deposit will be increased by 10% of the increase, if any, of the amount of its original offer, within one business day following the auction sale, which deposit will be held in Simon's Attorney Trust Account. If the Buyer is not the successful bidder, but is the second highest bidder, the proposed order approving the Sale will authorize Simon to hold the deposit until the closing with the successful bidder occurs. If the Buyer is not at least the second highest bidder, its deposit will be returned within two business days following the sale. The Bid Procedures provide that the highest and the second highest offeror shall place the deposit with Simon, to be held until the transaction is closed, or fails to close. If the transaction fails to close, the second highest offeror shall become the successful bidder and shall be required to close the sale.

14. **The Assets**

    (a)    The real estate consisting of the land and buildings located at 101 West 87th Street, New York, New York;

---

[1] The following information represents only a summary of certain pertinent provisions in the Contract and is not intended to be a complete recitation of its terms.

(b)     The furniture, fixtures, machinery and equipment owned by the Debtor and located therein; and

(c)     The Leases, documents and financial information that the Debtor has been able to secure from Yair Levy, the Debtor's former owner.

(d)     The collective bargaining agreement (the"CBA") between the Debtor and Local 32BJ of the Service Employees International Union CTW, CLC (the "Union")

## IV.

## DISCUSSION

15.     The proposed Sale satisfies the applicable standard for §363(b) Sales and the Assumption and Assignment of the Executory Contracts under §365 of the Bankruptcy Code. Section 363(b)(1) of the Bankruptcy Code provides that "[t]he trustee, after notice and a hearing, may use, sell, or lease, other than in the ordinary course of business, property of the estate." 11 U.S.C. §363(b)(1). Bankruptcy Code Section 1107(a) affords a debtor in possession the same rights. See 11 U.S.C. § 1107(a). Moreover, §105(a) of the Bankruptcy Code provides that bankruptcy courts "may issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of [the Bankruptcy Code]." 11 U. S.C. §105(a).

16.     Bankruptcy courts have a great deal of discretion in deciding whether to authorize a sale of a debtor's assets outside of the ordinary course of business. See <u>Old Carco LLC</u> (f/k/a Chrysler LLC) case no. 09-50002; <u>In re Chateaugay Corp.</u>, 973 F.2d 141, 144 (2d Cir. 1992). In addition to the notice and hearing requirements of Bankruptcy Code Section 363, the widely followed and liberal business justification test has been applied by courts in the Second Circuit in cases where a debtor wished to conduct a pre-confirmation sale of all or substantially all of its assets. <u>See</u>, e.g., <u>Committee of Equity Security Holders v. Lionel Corp. (In re Lionel Corp.)</u>, 722 F.2d 1063, 1070 (2d Cir. 1983), <u>In re Thomson McKinnon Sec., Inc.</u>, 120 B.R. 301, 307 (Bankr. S.D.N.Y. 1990); <u>In re Crowthers McCall Pattern. Inc.</u>, 114 B.R. 877, 881-82 (Bankr. S.D.N.Y.

1990); In re Oneida Lake Dev., Inc., 114 B.R. 352, 355-56 (Bankr. N.D.N.Y. 1990); In re Au NaturalRest., Inc., 63 B.R. 575, 580 (Bankr. S.D.N.Y. 1986).

17. Courts have made it clear that a debtor's showing of a sound business justification need not be unduly exhaustive. Rather, a debtor is "simply required to justify the proposed disposition with sound business reasons." In re Baldwin United Corp., 43 B.R 888, 906 (Bankr. S.D. Ohio 1984). Whether or not there are sufficient business reasons to justify a sale depends upon the facts and circumstances of each case. See Lionel, 722 F.2d at 1071. Such justifications exist in the present case.

18. When considering whether a debtor has demonstrated a sound business justification for a proposed sale of assets under Section 363(b) of the Bankruptcy Code, the United States Court of Appeals for the Second Circuit has held that a bankruptcy court "should consider all salient factors pertaining to the proceeding, including (a) the proportionate value of the asset to the estate as a whole, (b) the amount of time that has elapsed since the filing, (c) the likelihood that a plan of reorganization will be proposed and confirmed in the near future, (d) the effect of the proposed disposition on future plans of reorganization, (e) the proceeds to be obtained from the disposition vis-a-vis any appraisals of the property, (f) which of the alternatives of use, sale or lease the proposal envisions, and (g) whether the asset is increasing or decreasing in value. Lionel, 722 F.2d at 107 1; see also Stephens Indus., Inc. v. McClung, 789 F.2d 386, 389 (6th Cir. 1986) (following Lionel; In re Thomson McKinnon Sec., Inc., 120 B.R. 301, 308 (Bankr. S.D.N.Y. 1990). In evaluating these and other pertinent factors a court should bear in mind that the overriding goal is "to further the diverse interests of the debtor, creditors and equity holders, alike." Lionel, 722 F.2d at 1071.

19. The Debtors also seek approval to assume and assign their Leases with tenants of the building (most of which are subject to New York City rent control provisions) that are set

forth on Exhibit "K" annexed to the Contract and the CBA, pursuant to §365 of the Bankruptcy Code. Exhibit "K" to the Contract also contains the items the Debtor believes that it is required to cure at the Debtor's sole cost, in order to assume and assign the Executory Contracts. Section 365(a) of the Bankruptcy Code provides that a debtor-in-possession, "subject to the court's approval, may assume or reject any executory contract or unexpired lease of the debtors." 11 U.S.C. §365(a). Indeed, in this case the rental income does not presently cover the expense of operating the building and it makes significant sense to sell the Assets, so as to stop the losses being incurred. Courts have uniformly deferred to the business judgment of debtors to determine whether the assumption of an unexpired lease is appropriate under §365(a) of the Bankruptcy Code. See NLRB v. Bildisco & Bildisco, 465 U.S. 513, 523 (1984); Lubrizol Enterpr., Inc. v. Richmond Metal Finishers (In re Richmond Metal Finishers, Inc.), 756 F.2d 1043, 1046-47 (4th Cir. 1985); In re Minges, 602 F.2d 38, 42 (2nd Cir. 1979); In re Frank G. Lawson, 146 B.R. 663, 664-65 (Bankr. E.D. Va. 1992). To the extent that sound business reasons justify the assumption of a particular contract, assumption should be approved, particularly in this case, because the Buyer is willing to assume the post-closing liabilities related to the rent control leases.

20. The assumption and assignment of the Executory Contracts are to be made free and clear of the Tenant's rights, if any, to obtain any recovery from Buyer by way of offset from any payments due to the Buyer, for sums due by the Debtor, if any, or by another method or form of recovery, except for such sums that were incurred by the Buyer from and after the Closing Date, as hereinafter defined (hereinafter "Pre-Closing Date Offsets"). Pre-Closing Date Offsets shall be the responsibility of the Debtor and the Order approving the sale and the Contract shall direct the Tenants to make payments to the Buyer without deducting Pre-Closing Date Offsets, if any.

21. It is contemplated that the Buyer will be majority owned and controlled, directly

or indirectly, by BlackRock Cal 1 LLC (or its affiliate) and/or FB Strategic partners LLC (or its affiliate). Based on the Buyer's due diligence review of the Assets and the Buyer's plans for the Assets after consummation of the sale, Buyer believes that it will have sufficient liquidity to pay its debts as they become due, including any obligations under the Executory Contracts and/or unexpired leases that may be assumed and assigned to the Buyer in accordance with the applicable provisions of the Contract. To the extent required by the Court, the Buyer will be prepared at the hearing to consider final approval of the sale to supplement the record with additional evidence of its financial ability to perform under the Executory Contracts post-closing.

22. Assumption and assignment of the Executory Contracts is supported by the Debtor's sound business judgment and is in the best interests of the Debtor's estates and its creditors. The proposed assumption of the Leases preserves the rights of the rent controlled tenants. The Debtor does not believe that any cure payments are owed to the Tenants under the Leases.

23. <u>The Proposed Sale is Supported by Sound Business Judgment</u>

(a) Clear business reasons exist to justify the Debtor's sale of the Assets under Bankruptcy Code §363(b) and the proposed Plan. As set forth above, the proposed sale will provide a greater return to the Debtor's estate than would continued operation of the Debtor at this time. Moreover, the Debtor does not have the working capital to operate and would be required to continue to borrow funds from Garrison to stay in business. The benefits that will be conferred upon the Debtor's estate in connection with the proposed sale and the plan that will incorporate the sale, will provide for a recovery to creditors that would otherwise be left with no payment, if the sale and the Plan were not ultimately approved. It is, therefore, submitted that the sale of the Assets under the Plan is justified by providing for a distribution that unsecured creditors would not otherwise receive.

(b) For the reasons set forth above, it is clear from the circumstances of this case that a sale of the Assets at this juncture, pursuant to the terms contained in the Contract or pursuant to a higher or better offer made at an auction sale, is the best option available to the Debtor and its creditors.

(c) If Buyer emerges as the highest or otherwise best bidder for the Assets, under the Contract the Debtor will receive the gross amount of $48,000,000.00 all of which is subject to Garrison's liens and security interests. If a different entity emerges as the successful bidder following the auction, the Debtor will have received even more value for the Assets. Accordingly, the Debtor will be in a position to confirm a Plan that provides for distributions to creditors in accordance with the Bankruptcy Code's priority scheme.

(d) Pursuant to Rule 6004 (h) of the Rules of Bankruptcy Procedure an order authorizing such sale is stayed until 14 days after the entry of such order unless the Court orders otherwise. The Debtor believes that its Plan will be confirmed with the funds made available through the Auction process and confirmation of the Plan will occur at the same hearing during which the Auction Sale is conducted.

(e) Based upon the foregoing, the Debtor believes that a sale of the Assets at this time to Buyer, or the Successful Bidder, is justified under the <u>Lionel</u> sound business justification test and is necessary to maximize any return to the Debtor's creditors. Set forth below is a discussion of certain of the <u>Lionel</u> factors, which supports Movant's decision to sell the Assets to Buyer.

24. The proposed disposition of the Assets will provide the basis for funding the Plan. The Debtor's financial condition has become increasingly precarious. As set forth above, the Debtor believes that the sale of the Assets will maximize the value of the Assets and provide the best possible means of funding the Plan.

25. The Procedures Undertaken By Movant Assure That The
    Highest Value for the Assets Will be Received

    (a) The auction process contemplated by this Motion, which is incorporated in the Contract, will ensure that the Debtor obtains the highest or otherwise best offer for the Assets and will maximize the value received by the Debtor's estate. The Debtor will serve this Motion on all interested parties, who will have the opportunity to participate in the auction of the Assets. Eastdil has already conducted two separate qualifying bid processes to obtain the Stalking Horse Bidder. Accordingly, the Debtor believes the procedures undertaken and to be undertaken assure that maximum value will be achieved and that the proposed sale is in the best interest of the Debtor, its creditors and other parties in interest.

    (b) The Debtor and Eastdil have sought purchasers for the Assets for the past four (4) months, having conducted an exhaustive marketing effort with all known entities that could be interested in acquiring the Assets. Various entities evidenced interest, but the Buyer proposed the highest purchase price and is the only company that agreed to enter into the Contract on the terms set forth therein.

26. Movants Will Provide Reasonable And Adequate
    Notice Of The Sale To Interested Parties

    (a) By this Motion, the Debtor seeks to have this Court establish certain procedures relating to the notice of the proposed sale. Annexed hereto as "A" are the proposed Bid Procedures for which the Debtor seeks this Court's approval in the OSH, so that all parties interested in bidding at the proposed sale will be able to understand and fulfill the requirements to become a qualified bidder. In satisfaction of the requirements of Bankruptcy Rule 2002, the Debtor proposes to serve copies of this Motion, together with its exhibits, by first class mail upon (i) the United States Trustee, (ii) members of the Committee and their counsel, (iii) counsel to the Buyer, (iv) all persons who are known by the Seller to have liens upon or are asserting a

security interest in the Assets, (v) all 19 entities that have expressed to the Debtor an interest in purchasing the Assets, and (vi) those entities that have filed a notice of appearance. The Debtor will also send the proposed notice by email to all other entities (103) contacted by Eastdil in connection with the Debtor's proposed sale of the Assets.

(b) Annexed hereto as Exhibit "B" is a copy of the proposed notice of entry of the OSH to which is attached the proposed Bid Procedures as well as a copy of the original Eastdil Notice of the proposed sale of the Assets, in order that interested parties may be prepared to appropriately fulfill the bid procedure requirements.

27. Request for Approval of Proposed Sale Free and
<u>Clear of Liens, Claims, Interests and Encumbrances</u>

(a) The Debtor requests this Court's authority, pursuant to §§105(a), and 363(f) and 365 of the Bankruptcy Code, to sell the Assets free and clear of all liens, claims, interests and encumbrances which may be asserted against the Debtor as more fully set forth in the Contract (collectively, the "Encumbrances"), with Encumbrances to attach to the proceeds of sale. The Proposed order approving the sale is annexed as Exhibit "E" to the Contract.

(b) In accordance with §363(f) of the Bankruptcy Code, a debtor in possession may sell property free and clear of any Encumbrance on such property if:

(i) applicable non-bankruptcy law permits sale of such property free and clear of such interest;

(ii) such entity consents;

(iii) such interest is a lien and the price at which such property is to be sold is greater than the aggregate value of all liens on such property;

(iv) such interest is in bona fide dispute; or

(v) such entity could be compelled, in a legal or equitable proceeding, to accept a money satisfaction of such interest.

See 11 U.S.C. § 363(f); <u>In re Elliot</u>, 94 B.R. 343, 345 (E.D. Pa. 1988) (Section 363(f) is

written in the disjunctive; a court may approve sale "free and clear" provided at least one of the subsections is satisfied). In this case, Garrison consents the sale and will be funder of the payments to creditors under the Plan. A number of creditors filed mechanics liens against the Real Property that constitutes part of the Assets to be sold to Buyer. The Debtor has analyzed Garrison's lien position and the perfection and timing of Garrison's acquisition of its security interest in the Real Property and has determined that Garrison's liens are superior to the mechanics liens filed by certain creditors and unless there is competitive bidding for the Assets and the proceeds of sale exceed $53.4 million[2] at the Closing, the mechanics lienors hold merely unsecured claims. The Committee and the Debtor have finally come to terms regarding the Plan of Liquidation. The Debtor believes that Garrison's liens have been validly perfected and in view of the fact that Garrison has consented to the sale which will not satisfy its senior liens, the sale may be made free and clear of any subordinate liens. See, In re Beker Industries, 63 B.R. 474, 476 (Bankr.SDNY 1986) reversed on other grounds 89 B.R. 336 (SDNY 1988)

28. <u>Buyers Should be Afforded Good Faith Buyer Status Pursuant to Section 363(m)</u>

(a) Section 363(m) of the Bankruptcy Code provides that a reversal or modification on appeal of an authorized sale of property under §363(b) will not affect the validity of such sale to a good faith Buyer of the property. See 11 U.S.C. §363(m). In the Second Circuit, a bankruptcy court need not make an explicit finding of good faith in order to authorize a purchase under the Bankruptcy Code. <u>See</u> <u>Harbison-Fischer Mfg. Co. v. Zinke In re Zinke</u>, 97 B.R. 155, 156 (E.D.N.Y. 1989) (duty to make explicit good faith finding prior to authorizing sale or lease of property of estate "has not been imposed by the Second Circuit or the United States Supreme Court"). Although the Bankruptcy Code does not provide a definition of the term "good faith Buyer," courts construing Section 363(m) have held that, to show lack of good faith, a party must demonstrate "fraud, collusion . . . or an attempt to take grossly unfair

---

[2] The amount is what was due Garrison as at November 1, 2010.

advantage of other bidders. "See, e.g., Marin v. Coated Sales, Inc. (In re Coated Sales, Inc.), No. 89 Civ. 3 704, 1990 WL 212899, at *2 (S.D.N.Y. Dec. 13, 1990); In re Sasson Jeans Inc., 90 B.R. 608, 610 (S.D.N.Y. 1988) (quoting In re BelAir, Assoc., Ltd, 706 F.2d 301, 305 (10th Cir. 1983)). Because there is no bright line test, courts examine the facts of each case by concentrating on the "integrity of [an actor's) conduct in the course of the sale proceedings." In re Pisces Leasing Corp., 66 B.R. 671, 673 (E.D.N.Y. 1986) (quoting, In re Rock Indlis. Mach. Corp., 572 F.2d II 95, 1198 (7th Cir. 1978)).

(b) In the present case, the Contract is the product of arms length negotiations among the Debtor, the Secured Lender, and the Buyer. There is no legal relationship between Buyer and the Debtor or the Buyer and the Secured Lender.

(c) Further, pursuant to the proposed bid procedures, other interested parties will be invited to submit higher or better offers for the Assets, thereby ensuring that the offer ultimately approved by the Court will yield the highest possible price for the Assets. As a result, Movant believes that Buyer and any third party Buyer should be afforded the protection of §363(m) of the Bankruptcy Code.

29. The Break-Up Fee is Appropriate

(a) The Debtor seeks approval of a break-up fee for the buyer in the sum of $250,000 (approximately .52% of the proposed purchase price) should an alternative transaction be completed by the Debtors.

(b) Bankruptcy courts are guided by the principles of the "business judgment" rule in evaluating a debtor's decision to offer bidding protections. See In re Integrated Resources, Inc., 147 B.R. 650, 658 (S.D.N.Y. 1992) ("A bankruptcy court should uphold a break-up fee which was not tainted by self-dealing and was the product of arm's length negotiations."), appeal dismissed, 3 F.3d 49 (2d Cir. 1997). Bidding protections for buyers of Chapter 11 debtors and/or

their assets constitute appropriate compensation for the risk and expense involved in preparing and proposing a bid, which thereby enhances the value of the debtor's estate by attracting initial bids and establishing a minimum standard for competing bids. Bidding protections may take many different forms, including paying the out-of-pocket expenses incurred by a bidder in arranging the deal, including due diligence expenses, or compensating a bidder for its lost opportunity costs. See, In re Hupp Indus., Inc., 140 B.R. 191, 194 (Bankr. N.D. Ohio 1992). A break-up fee should be reasonably related to the bidder's efforts and the magnitude of the transaction." Integrated Resources, 147 B.R. at 662-63.

      (c)    In this case, the Break-Up Fee is $250,000 and is extremely reasonable based upon the amount proposed to be paid for the Assets and the time, energy and expenses undertaken by Buyer in making this offer. Movant respectfully submits that the potential payment of this amount is reasonable and should be approved by this Court.

## V.
## PROPOSED BIDDING PROCEDURES AND OBJECTIONS

30. Bankruptcy Rule 6004 contemplates that a debtor may conduct an auction to obtain the highest or otherwise best price for sale of its property. In connection with this Motion, the Debtor proposes to invite interested parties to make higher or better offers for the Assets. In order to manage the bidding process, the Debtor proposes that the bid procedures which are annexed as hereto as Exhibit "A" (the "Bid Procedures") be approved. The Bid Procedures are summarized below, but the Debtor urges all interested parties to review Exhibit "A", which contains all of the proposed Bid Procedures:

    (a)    In order to make a bid to purchase the Assets and be a qualified bidder, a potential bidder, on or before December 3, 2010 at 3:00 p.m. EST (the "Bid Deadline"), must serve a written intention to bid on the Assets upon counsel for the Debtor, the Committee, and the Secured Lender (collectively, the "Counsel").

    (b)    At or before the Bid Deadline, and in order to be considered a "qualified

bidder," a bidder shall (i) have completed its due diligence, (ii) provide the Counsel with a bid substantially in the form of the Contract, setting forth all terms upon which such bidder is willing to purchase the Assets, with the Contract marked to reflect any modifications and (iii) have delivered to Seller's counsel a good faith deposit equal to 10% of its initial higher offer, which shall not be less than $48,500,000 (such deposit to be made by bank or certified check).

(c) At or before the Bid Deadline, and in order to be considered a "qualified bidder" a bidder shall provide Counsel with (i) sufficient written information (by way of bank statements, commitment from a reputable financial institution, evidence of outstanding credit lines or otherwise) to demonstrate the potential bidder's ability to consummate its purchase of the Assets.

(d) If the Debtor receives bids from one or more qualified bidders, the Debtor will conduct an auction sale for the Assets. The Debtor shall retain the deposit of both the highest bidder and the second highest bidder until the Plan is confirmed and the Sale is closed. The ability of Debtor to retain the Buyer's deposit is governed by various provisions of the Contract.

(e) With respect to the Assets: (i) the Debtors will consider any initial overbid of at least $500,000 consisting of the Break-Up Fee ($250,000) plus $250,000 which is the initial overbid (and any additional overbids from a qualified bidder); the other bidder's offer must contain terms that are acceptable to the Debtor and Garrison; and provided, further, that such bids shall be substantially in the form of the Contract, shall set forth the terms upon which the bidder is willing to purchase the Assets, and shall be made by a qualified bidder that demonstrates an ability to consummate the proposed transaction promptly, as provided in the Contract, (ii) any bidding after the initial overbid must be in increments of at least $250,000 (iii) any competing bid shall be no more conditional than Buyer's bid, (iv) the successful bidder (if other than Buyer) will be required to execute immediately and deliver to counsel to the Debtor a copy of the Contract, containing substantially the same terms, with changes to incorporate the terms of the winning bid.

(f) If the Buyer desires to competitively bid against other bidders, it may include the Break-Up Fee in its Bid, so the actual cash the Buyer will pay at Closing will be $250,000 less than any other competitive bidder

(g) The additional Deposit in respect of the successful bid, must be made in cash or readily available funds at the rate of 10% of the increased amount for the purchase price and shall be paid by certified check or wire transfer concurrently with execution and delivery of the Contract, with the remaining purchase payment to be paid on the Closing Date (as defined in the Contract).

(h) Any objection to the sale or the assumption and assignment of the Executory Contracts, including, but not limited to, any objection relating to any cure amount and/or the adequate assurance of future performance, must be filed with the Bankruptcy Court and served so that it is received by Debtor's counsel by no later than 3:00 p.m. December 3, 2010.

(i) Any objection must set forth in detail the factual and legal grounds on which it is based, and all relevant supporting documentation must be attached to the objection. If an objecting party disputes the proposed cure amount, if any, the objection must identify the cure amount that the objecting party alleges to be accurate. The Debtor's records reflect that none of its leases with tenants have any cure amounts due from the Debtor thereunder.

(j) If a timely objection is filed, it will be considered at the hearing on the sale of the Assets. The Debtor shall cooperate with any objecting party in a good faith effort to resolve any objection prior to the hearing on the sale of the Assets.

(k) If no objection to the assumption and assignment of a particular Executory Contract is timely filed, then (i) the cure amount set forth in the cure schedule, listed on "A" to the Contract, for such Executory Contract shall be binding upon the non-debtor party to such Executory Contract and will constitute a final determination of the total cure amount required to be paid in connection with the assumption and assignment of such Executory Contract, (ii) the non-debtor party shall be deemed to have consented to the assumption and assignment of such Executory Contract, and (iii) the non-debtor party shall be barred and estopped from asserting against the Debtor or any purchaser that any additional amounts are due or other defaults exist under such Executory Contract .

31. The Debtor submits that the proposed notice and bidding procedures are reasonable, calculated to give interested parties an opportunity to be heard on the proposed sale and auction process and calculated to create a process designed to ensure that the Debtor's estate receives the highest or best offer for the Assets. The Bidding Procedures proposed by the Debtor are standard procedures that have been used in similar sales transactions and have been routinely approved by courts. Accordingly, movant requests this Court's approval of such procedures.

32. Movant requests that the proposed bidding procedures be approved by the Court as part of the Court's approval of the OSH.

# VI.
# PROPOSED NOTICE

33. Bankruptcy Rules 2002 and 6004 require 21 days' notice of a motion under §363 of the Bankruptcy Code. Bankruptcy Rules 6004, and 9007 give the Court general authority to regulate the procedures to be followed in connection with the sale of assets by a debtor outside the ordinary course of business and to regulate the form and manner of notices in connection with such sales. For the reasons set forth herein the Debtor requests that the Notice be approved as consistent with the information and conditions set forth in the proposed OSH and the proposed bid procedures.

34. The Debtor is proceeding by OSH, as opposed to a motion on ordinary notice, because the Debtor is concerned that unless the auction sale is scheduled promptly, the proposed purchaser may determine to modify or withdraw its offer. Significant time has been expended by all parties in an effort to finalize the proposed Contract and related documents. The Committee has been kept fully apprised of all events and has had an opportunity to comment of the pleadings. Indeed, the Committee, through its counsel has consented to the entry of the prefixed OSH. The Debtor is prepared to provide notice of entry of the OSH and hearings scheduled therein to the parties identified and in the manner set forth in the proposed Notice (Exhibit "B") and the OSH. The Debtor submits that such notice constitutes good and sufficient notice of the proposed auction sale and hearing thereon and the relief requested in the Motion.

# VII.
# CONCLUSION

**WHEREFORE**, for all of the foregoing reasons, Movant respectfully requests that this Court: approve (a) the prefixed OSH fixing a date for the auction sale and the hearing at which the sale under the Contract will be approved, subject to any higher or better made by any third parties on terms substantially similar to the terms of the Contract (Exhibit "C"), (b) the Notice of entry of the OSH in accordance with this Motion (Exhibit "B" together with Exhibit "D", the Eastdil Notice), (c) the Bid Procedures (Exhibit "A"); and following the auction sale, enter an order approving the sale in the form annexed as Exhibit "E" to the Contract; and grant such other and further relief as is just or proper.

Dated: New York, New York
     November 4, 2010            MARILYN SIMON & ASSOCIATES
                                      Attorneys for the Debtors

                                      By: /s/Marilyn Simon
                                           Marilyn Simon, Esq.
                                           110 East 59th Street, 23rd Floor
                                           New York, New York 10022
                                           (212) 759-7909
                                           msimon@msimonassoc.com