UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------X
In re:

**YL WEST 87th STREET, LLC,**

                    Debtor.

------------------------------X

Chapter 11

Case No. 09-16786 (AJG)

## DISCLOSURE STATEMENT  PURSUANT
## TO §1125 OF THE BANKRUPTCY CODE

### I.
### PRELIMINARY STATEMENT

YL West 87th Street, LLC (the "Debtor"), proponent of the Plan of Liquidation dated November 4, 2010 (the "Plan"), submits this disclosure statement dated November 4, 2010 ("Disclosure Statement") pursuant to §1125 of Title 11 of the United States Code (the "Bankruptcy Code") to all holders of Claims (the "Claimants") against or Interests in the Debtor in order to solicit acceptances or rejections of the Plan.

Accompanying this Disclosure Statement are copies of the following documents:

(a)      The Plan of the Debtor,

(b)      The proposed contract (the Buyer's Contract") between the Debtor and 191W87LLC (the "Buyer") or such other entity that shall be the successful bidder at the auction sale to be conducted by the Debtor to sell the Debtor's assets (the "Assets")  including the Debtor's real property consisting of the land and building owned by the Debtor and located at 101 West 87th Street, New York, New York (the "Real Property"), the rental income from and after the date the sale is closed, the Debtor's inventory, furniture, fixture and equipment, its interest in the executory contracts ("Executory Contracts") consisting of the Debtor's leases with Tenants of the Real Property (the "Leases"), contracts related thereto and the collective bargaining agreement between

1

the Debtor and Local 32BJ of the Service Employees International Union CTW, CLC (the "CBA" and together with the Leases, collectively, the "Assumed Executory Contracts"). The remaining executory contracts between the Debtor and third parties shall be rejected by the Debtor.

(c)     The notice fixing the date, time and place of a hearing to consider confirmation of the Plan and related matters, including objections to the Plan, and

(d)     For parties entitled to vote on the Plan, a Ballot for acceptance or rejection of the Plan.

The Court has scheduled a hearing to consider confirmation of the Plan on December 8, 2010 at 9:30 a.m. of such day, in Room 523, United States Bankruptcy Court, One Bowling Green, New York, New York 10004-1408. Except where expressly defined herein, capitalized terms used in this Disclosure Statement have the meanings ascribed to them in the Plan.

**The Court has directed that Ballots accepting or rejecting the Plan, substantially in conformity with Official Bankruptcy Form No. 30, a copy of which is included herewith, be received by counsel to the Debtor, Marilyn Simon & Associates, 110 East 59th Street, 23rd Floor, New York, NY 10022, no later than the close of business on December 3, 2010, from all holders of Claims or Interests, whose Claims or Interests are impaired by the Plan. Under the Bankruptcy Code, only classes of Claims and Interests that are "impaired" under the Plan may vote to accept or reject the Plan. Generally, a claim or interest is impaired if the holder's legal, equitable or contractual rights are changed under a plan. A plan is accepted by an impaired class of claims if the holders of at least two-thirds (2/3) in dollar amount and more than one-half (1/2) in number of the Claims of that class which vote, vote to accept the plan. A plan is accepted by an impaired class of interests if the holders of at least two-thirds (2/3) in amount of the allowed interests of such class which vote, vote to accept the**

**plan. Under the Plan, all Classes of Claims except for Class 2 Priority Claims are impaired, within the meaning of §1124 of the Bankruptcy Code. Accordingly, holders of Priority Claims shall be conclusively deemed to have accepted the Plan pursuant to §1126(f) of the Bankruptcy Code. A BALLOT FOR ACCEPTANCE OR REJECTION OF THE PLAN IS BEING PROVIDED TO ALL HOLDERS OF CLASS 1, Class 3 and Class 4 CLAIMS.**

This Disclosure Statement is being submitted for approval by the Honorable Arthur J. Gonzalez, United States Bankruptcy Judge in accordance with §105(d)(2)(B)(vi) of the Bankruptcy Code, which permits the Court to hold a joint hearing on the Disclosure Statement and the Plan. The Debtor and the official committee of unsecured creditors (the "Committee") believe the Disclosure Statement contains sufficient information for creditors to determine how to vote on the Plan and believe that the Court will find that the Disclosure Statement contains "adequate information," as that term is defined in §1125 of the Bankruptcy Code, to permit creditors and interested parties to make an informed judgment whether or not to object to the Plan. The majority of the members of the Committee have voted to recommend Plan to unsecured creditors. No other representations concerning the Debtor, its operations, the value of its property, the Claims against the Debtor or Interests in the Debtor has been authorized, and none should be relied upon in arriving at your decision to accept, reject, or object to the Plan.

Following the Filing Date, the Committee was appointed by the United States Trustee. The Committee has reviewed the terms of the Plan and has determined to recommend the Plan as it believes that without the Secured Lender's agreement to provide for payment to subordinate classes of creditors, there would be no funds available to pay to Class 3 (mechanics lienors) and Class 4 (unsecured claims). The Debtor submits that the Secured Lender's liens are superior to the Mechanics Liens and to the extent that the proposed sale of the Assets does not

provide for payment in full of the Secured Lender's Claim, there would be no funds available for other creditors, but for the Secured Lender's agreement to fund the Plan. Accordingly the Debtor and the Committee believe that the Plan is the most efficient and expeditious means to liquidate the assets of the Debtor, resolve claims and realize a recovery for all creditors. Annexed hereto as Exhibit "A" is a schedule listing the members of the Committee.

**CLAIMANTS AND INTEREST HOLDERS ARE URGED AND ENCOURAGED TO READ THIS DISCLOSURE STATEMENT AND THE PLAN IN FULL. THE PLAN REPRESENTS A PROPOSED LEGALLY BINDING AGREEMENT BETWEEN THE DEBTOR, ITS CREDITORS AND INTEREST HOLDERS AND THE COMMITTEE, AND SHOULD BE READ TOGETHER WITH THIS DISCLOSURE STATEMENT IN ORDER THAT AN INFORMED AND INTELLIGENT JUDGMENT CONCERNING THE PLAN CAN BE MADE. TO THE EXTENT THERE IS ANY INCONSISTENCY BETWEEN THE PLAN AND THIS DISCLOSURE STATEMENT, THE TERMS OF THE PLAN SHALL CONTROL.**

**EXCEPT AS OTHERWISE INDICATED, THE STATEMENTS CONTAINED IN THIS DISCLOSURE STATEMENT ARE MADE ONLY AS OF THE DATE HEREOF AND THERE CAN BE NO ASSURANCE THAT THE STATEMENTS CONTAINED HEREIN WILL BE CORRECT AT ANY TIME AFTER THE DATE HEREOF. FACTUAL INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT HAS BEEN PROVIDED BY THE DEBTOR'S MANAGEMENT, EXCEPT WHERE OTHERWISE SPECIFICALLY NOTED.**

**THIS DISCLOSURE STATEMENT SHALL NOT BE ADMISSIBLE IN ANY NON-BANKRUPTCY PROCEEDING INVOLVING THE DEBTOR, THE COMMITTEE**

**OR ANY OTHER PARTY, NOR SHALL IT BE CONSTRUED TO BE CONCLUSIVE ADVICE ON THE TAX, SECURITIES OR OTHER LEGAL EFFECTS OF THE PLAN TO HOLDERS OF CLAIMS AGAINST OR INTERESTS IN THE DEBTOR. THE INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT IS INCLUDED HEREIN FOR PURPOSES OF INFORMING CREDITORS OF THE PROVISIONS OF THE PLAN AND MAY NOT BE RELIED UPON FOR ANY PURPOSE OTHER THAN TO DETERMINE HOW THE PLAN AFFECTS CREDITORS AND INTEREST HOLDERS. Capitalized terms used herein are as defined in the Plan or in the Bankruptcy Code, as applicable.**

## II.
## DESCRIPTION AND HISTORY OF THE DEBTOR'S BUSINESS

1.      The Debtor purchased the Real Property from Columbus Green, LLC on October 21, 2005 for $42,500,000.  The Debtor intended to convert the Real Property into a condominium by (a) renovating existing residential units, (b) constructing an additional 40,000 square feet so as to add a four-storey townhouse, 23 additional residential units, and additional retail space, and (c) converting existing residential units into condominium ownership (the "Project").  Included in the Tenant Leases are fifteen (15) occupants of the residential apartments, 14 of whom have executed leases, the significant majority of which are subject to New York City rent control provisions.  There are six (6) commercial Tenants each of which have executed a lease.

2.      In an effort to fund the Project, on September 20, 2007 the Debtor borrowed funds from Column Financial, Inc. ("Column") aggregating $75,000,000 (the "Mortgage Loan").  On the same date, the Debtor's sole member, YL West 87th Holdings I LLC, a Delaware limited liability company ("Holdings") borrowed $20,000,000 from Column (the

"Mezzanine Loan"), which Column assigned to Garrison Special Opportunities Fund LP, a Delaware limited partnership on September 20, 2007. On December 7, 2007 Column assigned the Mortgage Loan to Arbor Realty SR. On June 30, 2009, Arbor Realty SR assigned the Mortgage Loan to Garrison Residential Funding LLC, (the "Secured Lender") an affiliate of Garrison Special Opportunities Fund LP ("Garrison").

3.     In May 2009 Holdings defaulted under the Mezzanine Loan. By letter dated June 8, 2009 Garrison notified Holdings of its default. Thereafter, by letter dated July 28, 2009, Garrison sent Holdings a notice of foreclosure sale. In accordance with the Uniform Commercial Code ("UCC") Garrison advertised notice of the secured party sale for three consecutive weeks in the New York Times, national edition as well as once in the Real Estate Weekly on September 5, 2009. The construction of the Project stopped and the condominium offering plan and sixteen contracts for sale of units in the Real Property were rescinded.

4.     On August 21, 2009 Holdings, and the Debtor filed a complaint against Garrison in the Supreme Court of the State of New York, County of New York (the "State Court") seeking various forms of relief. On September 8, 2009 Holdings filed an emergency motion with the State Court seeking a preliminary injunction to stay the foreclosure sale. The State Court conditioned the granting of a temporary restraining order on Holdings posting a $20,000,000 bond by 4:00 p.m. on September 9, 2009. Instead, on September 9, 2009 Holdings filed a chapter 11 case in the United States Bankruptcy Court for the Southern District of New York (the "Bankruptcy Court").

5.     On September 14, 2009 Garrison filed a motion in the Bankruptcy Court for relief under §362(d) of title 11 of the United States Code (the "Code") seeking relief from the automatic stay to enforce its security interests against Holding's interest in the Debtor. At a

hearing held before the Court on November 3, 2009 the Court determined that the automatic stay had been terminated under §362(e) of the Code, but reimposed the stay under §105(a) of the Code, pending an evidentiary hearing on the issue of Holding's equity in the Collateral under §362(d) of the Code.

6.     After hearing testimony and considering the arguments raised by the parties, the court determined, by opinion entered January 13, 2010, that Garrison's motion for relief from the automatic stay should be granted in that (a) Holdings had insufficient indirect equity in the Debtor's assets to permit the court to grant a priming lien to a new lender to obtain operating capital, and (b) Holdings could not prove that there was any likelihood it could meet the tests required to confirm an effective plan of reorganization.  On February 25, 2010 Garrison held a foreclosure sale at which it was the successful and only bidder and signed a memorandum of sale.

7.     On March 17, 2010 (the "Title Transfer Date"), pursuant to the powers granted to it by the UCC, Garrison assigned its rights under the memorandum of sale to Garrison Residential Funding II LLC ("Garrison II"), an affiliate of Garrison, to which entity was assigned the membership interest in the Debtor and is now the sole member of the Debtor. A review of the docket sheet in this case indicates that although the Debtor's petition and schedules have been filed, no application was ever filed or order ever entered approving the retention of counsel for the Debtor or any other professional in this case, and no operating statements were filed for the period prior to the Title Transfer Date.

### III.
### CHAPTER 11 FILING

8.     The Debtor commenced its own chapter 11 case on November 13, 2009 (the "Filing Date") and remained in possession of its assets and property pursuant to §§1107 and

1108 of the Code. The Debtor's petition and schedules indicate that other than minimal funds in Capital One N.A. and miscellaneous furniture, fixtures and equipment, the Debtor's main asset consists of the Real Property. As at the Debtor's Filing Date the Debtor's obligations to the Secured Lender aggregated $47,529,957.69.

9.      By Order dated April 6, 2010 the Debtor was authorized to retain the firm of Marilyn Simon & Associates ("Simon") as its Bankruptcy Counsel. The Debtor determined that it would not make financial sense to expend the additional funds required to update and build additional space on the building and its land and has determined to sell the Assets under a plan of liquidation. Accordingly, by Order entered June 17, 2010, the Debtor retained the firm of Eastdil Secured, L.L.C. ("Eastdil"), to market and sell the Assets.

10.     Eastdil has been successful in locating 101W87 LLC (the "Buyer"), an affiliate of FB Strategic Partners LLC, as a stalking horse bidder (the "Stalking Horse Bidder") which has made an offer to purchase the Assets pursuant to the terms of the proposed Buyer's Contract that has been negotiated among the Debtor, the Secured Lender and the proposed Buyer as a stalking horse bidder. The Contract has been reviewed and approved by counsel to the Committee, and is subject to a higher or otherwise better offer that may be made at an auction sale to be held in Court on December 8, 2010.

11.     The Debtor has drafted a Plan of Liquidation dated November 4, 2010 (the "Plan") the terms to which the Committee has agreed t recommend to unsecured creditors, based upon its belief that there exists little evidence to support a finding that the interests of the Mechanics Lienors in the Real Property are superior to the lien of the Secured Creditor and it is extremely unlikely that any litigation seeking to subordinate the Secured Lender's lien would be successful. After many weeks of negotiation, the Committee has determined that the Debtor's

proposal to sell the Assets, free and clear of all liens, claims, interests and encumbrances pursuant to §§105(a) and 363(b), (f), (m), 365, 503(b) and 507 of the Code, together with the Secured Lender's agreement to fund the Plan will provide, for payment to creditors that would otherwise have no recovery for their claims.

**IV.**
**<u>SUMMARY OF THE ASSET PURCHASE AGREEMENT</u>**

        12.      At closing of the sale of the Assets, which is to occur following entry of the order approving the sale (the "Sale Order") and the order confirming the Plan (the "Confirmation Order"), the Debtor will transfer all of its, right, title and interest to the Assets including its assumption and assignment of the Assumed Executory Contracts, consisting of the Tenant Leases and the collective bargaining agreement, to the highest bidder at the Auction Sale, pursuant to §1146(a) of the Code, in accordance with the Confirmation Order and the Sale Order. Pursuant to the Contract the consideration (the "Purchase Price") to be delivered in exchange for the Assets will be $48,000,000. If the proposed sale is approved, it is anticipated that the closing will take place on the fifth Business Day after the Sale Order becomes a Final Order.

        13.      The Contract has been executed and the Buyer has tendered a 10% deposit in the sum of $4,800,000, which is being held in escrow by Simon pending the conclusion of the auction sale. If the Buyer is the successful bidder, the deposit will be increased by 10% of the increase, if any, of the amount of the Buyer's original offer, within one business day following the auction sale, which deposit will be held in Simon's Attorney Trust Account. If the Buyer is not the successful bidder, but is the second highest bidder, the proposed Sale Order will authorize Simon to hold the Buyer's deposit until the closing with the successful bidder occurs. If the Buyer's bid is not at least the second highest offer, its deposit will be returned within two business days following the entry of the Sale Order which has become a Final Order, together

with interest earned thereon. If for some reason the closing with the highest bidder (who is not the Buyer) does not occur, the Bid Procedures provide that the Buyer, or the entity that is the next highest offeror (if not the Buyer) shall place the deposit with Simon, to be held until the transaction is closed, or fails to close. If the transaction fails to close with the highest bidder, the next highest bidder shall become the successful bidder and shall be required to close the sale. The definition "Buyer" shall hereinafter include the successful bidder or the second highest bidder at the auction sale.

14      The assumption and assignment of the Tenant Leases to the Buyer are to be made free and clear of the Tenant's rights, if any, to obtain any recovery from the Buyer, by way of offset from any payments due to the lessees by the Debtor, or by another method or form of recovery (hereinafter "Pre-Closing Date Offsets"), except for such sums that were incurred by the Buyer from and after the Closing Date. The Tenants do retain such rights against the Debtor and the Debtor has filed a motion on notice to all the Tenants, both residential and commercial, the purpose of which is to determine what claims if any the Tenants may have against the Debtor. The Debtor indicates that except for security deposits that were to have been held by the Debtor, there are no other cure claims. Under the Contract the Buyer has agreed to assume the responsibility to return security deposits to Tenants, if that right has been earned by the tenant. The Secured Lender has agreed to be responsible for any other cure obligations. The assumption and assignment of the CBA shall be effective as of the Sale Closing Date with the Debtor, and the cost to cure such obligations incurred up to and including the Sale Closing Date shall be funded by the Secured Lender. The Sale Closing Date shall occur within five (5) business days after the Sale Order has become a Final Order. The Confirmation Order shall approve the Contract, incorporate the provisions of the Sale Order, and direct the Tenants to make payments

to the Buyer without deducting Pre-Closing Date Offsets, if any. The Pre-Closing Date Offsets shall be the sole responsibility of the Debtor and the Secured Lender.

15.	The Debtor does not have the working capital to operate and would be required to continue to borrow funds from the Secured Lender to preserve the Real Property. Failing the Secured Lender's agreement to pay any sum to creditors, no funds would be available for creditors under a Plan other than the Secured Lender. If Buyer emerges as the highest or otherwise best bidder for the Assets, under the Contract the Debtor will receive $48,000,000.00 all of which is subject to the Secured Lender's liens and security interests. The Secured Lender has agreed to share in the recovery with unsecured creditors, by depositing $750,000 with the Disbursing Agent for distribution to Class 3 and Class 4 Claims under the Plan and $50,000 to Committee Counsel to be held as the Committee Counsel Fund which will provide for the fees and expenses of Committee Counsel in connection with objections to claims and the calculation and distribution of payments to Class 3 and Class 4 creditors. Any unconsumed funds in the Committee Counsel Fund will be added to the Deposit for Class 3 and Class 4 creditors. If the purchase price at the auction exceeds $50,500,000.00, the Secured Lender has agreed that ten (10%) of such excess will be shared with Class 3 and Class 4 creditors on a pro rata basis.

16.	In addition to the costs advanced by the Secured Lender to cover shortfalls in the Debtor's operating costs, the Secured Lender has agreed under the Plan to pay all Priority Claims (estimated to exceed $2,000,000) in full, the $500,000 commission to Eastdil, Professional fees and expenses of the Professional Persons incurred through the Effective Date, estimated to approximate $200,000 and shall continue to pay the expenses of the Debtor's Bankruptcy Counsel and the Debtor's Accountant their fees and expenses until such date as their work is concluded. Such additional payments provide even more value to the Estate.

17.     Pursuant to the bidding procedures approved by the OSH

a.      Other interested parties will be invited to submit higher or better offers for the Assets, thereby ensuring that the offer ultimately approved by the Court will yield the highest possible price for the Assets.  Thus, the Confirmation Order and the Sale Order will grant the Buyer the protections of Section 363(m) of the Code.

b.      The Buyer is granted a break-up fee in the sum of $250,000 (approximately .52% of the proposed purchase price) should an alternative transaction be completed by the Debtor.

c.      In order to make a bid to purchase the Assets and be a qualified bidder, a potential bidder, on or before December  3, 2010 (the "Bid Deadline"), must serve a written intention to bid on the Assets upon counsel for the Debtor, the Committee, and the Secured Lender (collectively, the "Counsel").

d.      At or before the Bid Deadline, and in order to be considered a "qualified bidder," a bidder shall provide the Counsel (i) with a bid substantially in the form of the Contract, setting forth all terms upon which such bidder is willing to purchase the Assets, with the Contract marked to reflect any modifications, together with a good faith deposit equal to 10% of its initial higher offer, which shall not be less than $48,500,000 (such deposit to be made by bank or certified check).

e.      At or before the Bid Deadline, and in order to be considered a "qualified bidder," a bidder shall provide Counsel with (i) sufficient written information (by way of bank statements, commitment from a reputable financial institution, evidence of outstanding credit lines or otherwise) to demonstrate the potential bidder's ability to consummate its purchase of the Assets.

f.      If the Debtor receives bids from one or more qualified bidders, the Debtor will conduct an auction sale for the Assets.  The Debtor shall retain the deposit of both the highest bidder and the second highest bidder until the Sale Closing Date has occurred.

g.      With respect to the Assets:  (i) the Debtor will consider any initial overbid of at least $500,000 consisting of the Break-Up Fee ($250,000) plus $250,000  which is the initial overbid (and any additional overbids from a qualified bidder) provided that the other bidder's offer contains terms that are acceptable to the Debtor and the Secured Lender; and provided, further, that such bids shall be substantially in the form of the Contract, shall set forth the terms upon which the bidder is willing to purchase the Assets, and shall be made by a qualified bidder that demonstrates an ability to consummate the proposed transaction promptly, as provided in the Contract, (ii) any bidding after the initial overbid must be in increments of at least $250,000 or in such other amounts as the

Debtor may approve at the sale, (iii) any competing bid shall be no more conditional than Buyer's bid, (iv) the successful bidder (if other than the Buyer) will be required to execute immediately and deliver to counsel to the Debtor, a copy of the Contract, containing substantially the same terms, with changes to incorporate the terms of the winning bid.

       h.      The additional Deposit in respect of the successful bid, must be made in cash or readily available funds at the rate of 10% of the increased amount of the purchase price and shall be paid by certified check or wire transfer concurrently with execution and delivery of the Contract, with the remaining purchase payment to be made on the fifth (5) business day following entry of a Final Sale Order.

       i.      Any objection to the sale or the assumption and assignment of the Executory Contracts including, but not limited to, any objection relating to any cure amount and/or the adequate assurance of future performance, must be filed with the Bankruptcy Court and served by no later than December 3, 2010.

       j.      Any objection must set forth in detail the factual and legal grounds on which it is based, and all relevant supporting documentation must be attached to the objection.  If an objecting party disputes the proposed cure amount, if any, the objection must identify the cure amount that the objecting party alleges to be accurate.  The Debtor's records reflect that none of Leases have any cure amounts due there under.

## V.
## OTHER ISSUES

      18.      Shortly after its retention, Debtor's counsel obtained entry of an Order to show cause, signed April 12, 2010, against the Debtor's former counsel and Yair Levy ("Levy"), the Debtor's former principal, directing said entities to turn over the books and records of the Debtor to Simon.  The Debtor entered into a stipulation with its former counsel, pursuant to which said counsel delivered the information in its possession to the Debtor.  In the stipulation, former counsel represented that they had no original documents in their possession. Levy turned over some records, but the only accounting record delivered was the opening of a debtor in possession checking account on January 1, 2010, which as at March 15 2010 was overdrawn by $284.65.  No tenant security deposits were delivered to the Debtor although a substantial number of the Leases provided

for the payment of security deposits the total of which is estimated at in excess of $84,000.  In accordance with the Contract the Buyer assumes the responsibility to refund security deposits, when appropriate, to the Tenants entitled thereto.

19.     Although the records are not fully complete, Simon has in its possession all of the books and records that were delivered by Debtor's previous counsel and Levy.  The Debtor has been filing Operating Statements from and after the period commencing January 1, 2010, which is the first date reflected by the records delivered to Debtor's counsel that Holdings made deposits on behalf of the Debtor in a separate debtor in possession account.  The Debtor has not been able to obtain records regarding any Debtor account for a prior period.

20.     By Motion dated May 4, 2010 the Debtor moved to reject two leases.  The first lease was with Jimmie Perla, for Apartment 3M, who had sublet the space to Emily Veraga.  The Debtor entered into a stipulation with both Veraga and Perla pursuant to which Veraga would remain in possession of the apartment until May 31, 2011, provided she paid the rent of $800 per month directly to the Debtor and not Perla.  The lease and sublease are to terminate May 31, 2011 and Veraga is to vacate the apartment on or before that date, leaving it broom clean.

21.     The second lease dated March 2, 2009 was with Platinum Creations, an entity owned by Yair Levy, the Debtor's former principal, for premises known as Apartments 5J, 5H, and 5K and 1A comprising 3,889 square feet (collectively, the "Apartments") as Levy's residence, not as an office, at an aggregate rental of $2,000 per month.  The Debtor estimates that the market rate for the apartments is $30 per square foot, which would approximate $10,000 per month.  The Debtor and the Committee commenced an adversary proceeding (the "Complaint") to terminate the Lease as a fraudulent conveyance.  The Complaint was settled pursuant to an

agreement, approved by Court order dated October 26, 2010, pursuant to which Levy vacated the Apartments on September 30, 2010, waived all his claims in connection with the case and the Secured Lender released all its claims against Levy for Levy's personal guaranty of the debts the Debtor owed the Secured Lender.

22.     The Court fixed September 24, 2010 as the last date to file claims (the "Bar Date").   The schedules filed by the Debtor before the Secured Lender completed its Uniform Commercial Code foreclosure, indicate that Unsecured Claims including Mechanics Liens aggregate $3,763,166.  The Unsecured Claims (including Mechanics Lien Claims) that were timely filed plus those unsecured claims that were scheduled, but not filed, aggregate approximately $32 million which sum includes personal injury suits filed by a previous retail tenant, its owner and a partner in the enterprise against the Debtor and other entities for $25,000,000 in the aggregate.  The Debtor is presently negotiating stipulations with these entities that will modify the automatic stay of §362 of the Code, to permit the litigations to continue provided that the plaintiffs agree to limit their recovery to the amounts available under the applicable insurance policies and otherwise waive their claims against the estate.     When entered, these stipulations will reduce the asserted claims to approximately $7 million which sum exceeds the amounts set forth in the Debtor's schedules by approximately $3 million.     Two million of the $3 million discrepancy is on account a $2 million claim filed by Lira Stone on account materials ordered by but not delivered to the Debtor.  The Committee intends to object to Lira Stone's claim.  A New York City real estate tax claim in the amount of $1,937,737.65 has been filed, which the Debtor believes is due and will be paid by the Secured Lender out of its share of the proceeds of the sale of the Assets.  An administration claim was filed by Forcelli Curto in the amount of $83,126.58 – the firm represented the Debtor's managing member in

Holdings chapter 11 case, but never sought retention as counsel to this Debtor. The Debtor believes the amount claimed by the law firm is subject to various valid objections. Garrison also filed an unsecured claim in this case which will be withdrawn assuming the Plan is confirmed and the sale is closed.

23.     The Debtor has met with the Committee and reviewed all the documents, motions and proposed orders with counsel to the Committee after its retention, before the pleadings were submitted to the Court. The Debtor has negotiated the Plan with the Committee, which recommends approval of the Plan. Both the Debtor and the Committee believe that failure to confirm the Plan will likely result in Unsecured Creditors receiving no payment with respect to their Claims. The payment to Creditors under the Plan will vary based upon the amount for which the Assets are sold following the Auction Sale and upon the success of the Committee in prosecuting objections to claims. Assuming the Debtor's schedules are correct and it costs counsel to the Committee approximately $25,000 to conclude the objections to claims and perform its duties as Disbursing Agent, the amount payable to creditors, if there is no competitive bidding for the Assets would approximate a sum between eleven (11%) and eighteen (18%) of their claims.

## VI.
## INTRODUCTION TO THE PLAN

The Plan provide for the division of Claims and Interests into classes:

Class 1 is comprised of the Secured Claim.

Class 2 is comprised of Priority Claims.

Class 3 is comprised of Mechanics Lien Claims and

Class 4 is comprised of Unsecured Claims including Claims for damages arising from the rejection of executory contracts.

Class 5 is comprised of holders of Interests.

## VII.
## ANALYSIS OF THE PLAN

A Class is not impaired within the meaning of the Code if under the Plan the holders of Allowed Claims in such Class receive the Allowed Amount of their Claims in Cash or other property of the Debtor equal to the Allowed Amount of such Claim or Interest as of the Consummation Date of the Plan. Claims in Class 1, Class 3 and Class 4 are impaired under the Plan. Class 5 is not impaired since it retains its interest in the Debtor but gets no distribution under the Plan, pursuant to which all of the Debtor's known assets are to be sold.

Administrative Claims consist of claims incurred during the pendency of the Debtor's Case in the ordinary course of business, as well as Professional Fee Claims fixed by Final Orders. The Allowed Amount of Administrative Claims shall be satisfied, settled and discharged, in full, provided the Confirmation Order has become a Final Order, by the payment in Cash on (a) the Effective Date or as soon as practicable thereafter, (b) when due in accordance with their terms, or (c) upon such terms as may be agreed upon between the Debtor and the respective Claimant entitled to such payment. Administrative Claims unpaid as of the Confirmation Date (including Professional Fees) and payments of post confirmation fees and expenses to the (i) Office of the United States Trustee pursuant to 28 U.S.C. §1930(a)(6) and (ii) Professional Persons, shall be paid by the Debtor through advances by the Secured Lender, provided that prior notice has been given to the Debtor and the Committee and no objection thereto has been raised. If an objection has been asserted and remains unresolved, then such Professional Person shall file an application for allowance with the Court, which shall determine the amount of the fee and expenses payable to such Professional Person. The Secured Lender has been advancing funds to the Debtor to enable it to pay Administrative Claims as they become due.

The only outstanding Administrative Claims that remain to be paid are claims to Professionals retained in this case and amounts that may be due the office of the United States Trustee for quarterly fees. There is a sum claimed by Forcelli Curto, counsel to Holdings, the Debtor's prepetition affiliate, and alleged counsel to the Debtor in the amount $83,126.58 as an Administrative Claim. The only work the firm did for the Debtor in this case is file the schedules - there were no first day orders submitted, nor even a motion to retain the firm as the Debtor's counsel. There are sums due to the Professionals retained by an order of this Court equal to the 20% fee holdback pursuant to this Court's Compensation Order entered April 6, 2010 and the US Trustee Fees, that are not yet due.

The Court fixed September 24, 2010 as the Bar Date for filing all Claims except for Professional Fee Claims and the US Trustee Fees. The Debtor's Bankruptcy Counsel, Marilyn Simon & Associates, received a post-petition retainer of $50,000 all of which was consumed prior to September 1, 2010. Debtor's Bankruptcy Accountant received no retainer and the Accountant and the Simon Firm are being paid 80% of fees and 100% of expenses on a monthly basis during the pendency of this case, in accordance with the Compensation Order. The Secured Lender has retained Special Real Estate Counsel to advise it in connection with issues regarding the Leases. Said real estate counsel is being paid directly by the Secured Creditor and will not be filing an application for allowance in this case. Committee Counsel received no retainer and is being paid its fees and expenses in accordance with the Compensation Order. The Professional Persons estimate that unpaid post-petition fees through September, 2010 approximates $30,000. Garrison has agreed to advance unpaid fees and expenses to the Professional Persons as fixed by this Court through the Effective Date, and amounts payable for US Trustee fees, without seeking additional recovery from the estate.

The Plan provides that the Allowed Class 1 Secured Claim is impaired and shall receive the proceeds of sale of the Assets securing such the Claim, less expenses including the Priority Claims, the East-dil brokerage fee of $500,000.00 and the fees and expenses of the Professional Persons through the Effective Date[1] and thereafter the fees and expenses due to the professionals retained by the Debtor pursuant to Final Order of the Court. Although a number of mechanics liens have been filed by prepetition vendors who performed work at the Real Property, the Debtor submits that such liens are unsecured and shall be deemed satisfied and discharged by payment to be made to Unsecured Creditors under the Plan. The Final Confirmation Order will contain a provision that directs that the county clerk in the counties in which such liens have been filed to record a satisfaction and discharge of such liens. Accordingly, the only Secured Claim is the claim held by the Secured Lender which as at November 1, 2010 aggregates $53,398,754.85. The Secured Lender has agreed to share ten (10%) of the proceeds of the sale of the assets in excess of $50,500,000 to enhance the payment to creditors under the Plan.

The Plan provides that Class 2 Priority Claims filed in the amount of $1,956,684.20 (which includes the New York City real estate taxes) are not impaired and will be paid in full in cash by the Secured Lender on the Sale Closing Date. If the case is converted to chapter 7 and Secured Lender no longer advances funds to the Debtor for operations and other costs – there will be no proceeds available for creditors unless the Assets are sold for in excess of $55 million.

The Plan provides that the Allowed Class 3 and Class 4 Claims shall be satisfied, settled and discharged by their pro rata share in Cash on the Consummation Date from the

---

[1] The fees of Committee Counsel in connection with the validity and perfection of the Secured Lender's Lien, is to be paid out

payment by the Secured Lender of Cash paid within two (2) business days following the Effective Date, of the sum of $750,000, plus the ten (10%) if any of the proceeds of sale in excess of $50.5 million, plus the amount if any remaining from the additional $50,000 deposited with Committee Counsel to fund its costs and expenses to complete the objections to Claims. The Consummation Date is to occur within sixty (60) days following the completion by Committee Counsel of all objections to Unsecured Claims, unless further extended by Court Order.

A Class is not impaired within the meaning of the Bankruptcy Code if, under the plan, the holders of Allowed Claims in such Class receive the Allowed Amount of their Claims in Cash or, in the case of Secured Claims, the Claimant's collateral equal to the Allowed Amount of such Claim or Interest as of the Consummation Date of the Plan. Under the Debtor's Plan, the Secured Lender will be paid the net proceeds available from Sale Closing Date up to $50,500,000 plus ninety (90%) percent of any higher sum paid on the Sale Closing Date, which sum will reimburse the Secured Lender its costs for the Professional Fees, the Payment of Allowed Priority and Administration Claims and its post-petition advances to the Debtor so that the Debtor could continue to operate in the Case. In event that the net proceeds of sale exceed $53,398,751.85[2] such excess will be paid to the Class 3 creditors on a pro-rata basis. If there are sufficient funds to pay class 3 creditors in full, the excess, if any, shall be paid to Class 4 creditors on a pro-rata basis. Holders of Interests will retain their interest in the Debtor, are not impaired under the Plan, but will receive any distribution under the Plan.

---

of the Committee Counsel Fund. If a dispute arises it will be submitted to the Court for resolution.

[2] Consisting of its Allowed Claim as of the Filing Date plus interest, fees, expenses calculated through November 1, 2010, payment of Professional Fees estimated at $300,000, post petition advances to the Debtor for operating costs, as well as sums to be paid on the Sale Closing Date of approximately $2,000,000 in priority claims and $500,000 to the Real Estate Broker.

Administrative Claims consist of claims incurred during the pendency of the Debtor's Case in the ordinary course of business, as well as Professional Fee Claims fixed by a Final Order and the US Trustee Fees. The Allowed Amount of Administrative Claims shall be satisfied, settled and discharged, in full, provided the Confirmation Order has become a Final Order, by the payment in Cash of 100% of their Allowed Claims (a) following the Effective Date or as soon as practicable thereafter, (b) when due in accordance with their terms, or (c) upon such terms as may be agreed upon between the Debtor and the respective Claimant entitled to such payment. Administrative Claims unpaid as of the Confirmation Date (including Professional Fees) and payments of post confirmation US Trustee Fees and to Professional Persons through the Effective Date, shall be paid by the Secured Lender, provided that prior notice has been given by the Professional Person, to the Secured Lender, the United States Trustee and counsel to the Committee and no objection thereto has been raised. If an objection has been asserted and remains unresolved, then such Professional Person shall file an application for allowance with the Court, which shall determine the amount of the fee and expenses payable to such Professional Person. Committee Counsel shall be paid its post-Effective Date fees and expenses first from the Committee Counsel Fund and next from the remaining funds in the Deposit, but in that case only following the filing of an application for allowance therefore with the Court. The Professional Persons retained by the Debtor will continue to be paid by the Secured Lender their fees and expenses earned after the Effective Date.

Payment with respect to all Classes of Claims to which no objection has been filed shall be made on the Consummation Date which will be within sixty (60) days after the completion of objections to unsecured Claims.

The Plan provides that the Debtor may file objections to the allowance of any

Priority Claim and Administrative Claim within ninety (90) days following the Confirmation Date or such later date approved by Final Order of the Court. Claims, filed after the Bar Date except for Administrative Claims will not be permitted to share in any distribution to Claimants under the Plan.

The absolute priority rule of the Bankruptcy Code requires that a plan may not provide for payment to a junior class unless it provides for payment in full to the superior classes of creditors, unless the superior class consents to such treatment. The Plan satisfies the absolute priority rule because the Secured Lender has agreed to make the payments to the junior classes under the Plan. Although equity interest holders are retaining their interest, the absolute priority rule is not violated as long as Class 4 Unsecured Creditors vote in favor of the Plan.

It is believed that the Plan can be confirmed on December 8, 2010 and the Effective Date will occur on the Sale Closing Date.

## VIII.
## ALTERNATIVES TO THE PLAN

If the Plan is not confirmed, the only alternatives will be for the Secured Lender to move to lift the automatic stay of §362 of the Code or conversion of the Debtor's Chapter 11 Case to a case under Chapter 7 of the Bankruptcy Code or dismissal of the Chapter 11 Case. The Debtor submits that the Plan affords holders of Claims and Interests the potential for the greatest and fastest realization on their Claims and, therefore, is in the best interests of such holders.

If the Chapter 11 case were converted to liquidation under Chapter 7 of the Code, there would be no funds to pay Creditors because the Secured Lender is secured by all the Debtor's Assets and is owed more than the proposed purchase price for the Real Property. Annexed hereto as Exhibit "B" is a liquidation analysis that sets forth the various classes of Claims and Interests under the Plan and the amounts asserted by each class of Claims and

Interests.  In any of the foregoing events, there would be no funds available to pay a trustee in bankruptcy or the trustee's professionals, and clearly nothing available for Unsecured Creditors. The only funds the Debtor had in its accounts were handled by Yair Levy, the Debtor's former principal and at the time of the commencement of the case there were no funds in the Debtor's accounts.  Thus, the Debtor submits that the Plan represents the best available alternative for maximizing the return to holders of Claims and Interests.

## IX.
## ANALYSIS OF BANKRUPTCY ACTIONS

The Plan provides that the Debtor shall not commence any actions against holders of Claims, consisting of the Debtor's causes of action including actions to collect accounts receivable (exclusive of rental income) due the Debtor, whether or not commenced as of the date hereof, whether or not arising under the Bankruptcy Code, including actions and causes of action pursuant to §§544, 547, 548, 549 and 550 thereof, including all claims against creditors for alleged fraudulent transfers under state law utilizing Section 544 of the Bankruptcy Code.  The Debtor believes that it has no viable claims under those sections.

## X.
## MISCELLANEOUS

By order dated August 12, 2010 the Court fixed September 24, 2010 as the last day by which all Creditors (except holders of Professional Fee Claims[3] and the U.S. Trustee) may assert

---

[3]  Applications for allowance of compensation by Professionals retained in this Case will be heard by the Court shortly following confirmation of the Plan.

pre-petition Claims against the Debtor.  Any holder of a Claim against the Debtor that failed to file a proof of Claim on or before the Bar Date (and which was listed on the Schedules as contingent, disputed and unliquidated) will not, with respect to such Claim, be treated as a creditor for purposes of distribution under the Plan, and is forever barred, estopped and enjoined from asserting such Claim against the Debtor or its estate.  The Debtor recently modified its Schedules to include Pearlgreen Corporation ("Pearlgreen") as a Mechanics Lienor in place of its counsel. Pearlgreen had not filed a claim although notice of the Bar Date was given to the counsel scheduled.  The amendment is to clarify that the claimant is Pearlgreen and to give Pearlgreen an opportunity to file a claim.

Unclaimed Distributions (including Distributions made by checks that have not been negotiated by the payee) shall be retained by the Disbursing Agent and held in trust for the beneficial holders of Allowed Claims entitled thereto for a period of ninety (90) days after the Distribution Date.  Any Distribution remaining unclaimed during that period shall be canceled (by a stop payment order or otherwise), the Claim(s) relating to such Distributions(s) shall be deemed forfeited and expunged, the holder of such Claim shall be removed from the Distribution schedules and the Distribution shall be deposited in the Committee Counsel's Funds for Distribution as provided under the Plan, following ten (10) Business Days written notice to the beneficial holders of such Claims. All Distributions shall be made to the holders of Claims at the address listed on their respective proofs of claim filed with the Court or, if no proof of claim has been filed, at the address listed in the Schedules.

## XI.
## TAX IMPLICATIONS OF PLAN

The following discussion is a summary of certain anticipated federal income tax consequences of the transactions proposed in the Plan to the Debtor and to the holders of Claims against or Interests in the Debtor. The summary is provided for informational purposes, only and is based on the Internal Revenue Code (the "Tax Code"), treasury regulations, judicial decisions and administrative determinations, all as in effect on the date of this disclosure statement and all subject to change, possibly with retroactive effect.

The summary does not address all aspects of federal income taxation that may apply to a particular holder of a Claim or Interest in light of such holder's particular facts and circumstances or to certain types of holders of Claims or Interests subject to special treatment under the Tax Code (such as financial institutions, broker-dealers, life insurance companies, tax-exempt organizations, non U.S. taxpayers and holders who received Claims or Interests in connection with the performance of services) and also does not discuss any aspects of state, local, or foreign taxation.

No ruling will be sought from the Internal Revenue Service ("IRS") with respect to any of the tax aspects of the Plan and the Debtor has not obtained any opinion of counsel with respect to such consequences. Accordingly, each holder of a Claim or Interest is strongly urged to consult with its accountants or other tax professional as to the tax consequences of the Plan.

A.      **U.S. Federal Income Tax Consequences to the Liquidation of the Debtor**

The Debtor believes that no additional taxes will be incurred for the Debtor's estate as a result of the Debtor's sale of its Real Estate, as set forth in the Plan. Generally, the discharge of a debt obligation by a debtor for an amount that has a fair market value or issue price that is less than the adjusted issue price of the indebtedness creates cancellation of indebtedness income ("COD Income"). However, COD Income is not recognized by a taxpayer that is a debtor in a

reorganization case if a discharge is granted by the Court or pursuant to a plan of reorganization approved by the Court. Thus, a plan of reorganization that discharges certain debt, if approved by the Court would enable a debtor to qualify for this exclusion. However in this it is a Plan of liquidation and therefore, there is no discharge.

B.     **Federal Income Tax Consequences to Claim Holders.**

The Federal income tax treatment of holders of Claims generally depends on whether such Claims are treated as "securities" for Federal income tax purposes. It is likely that the holders of Claims to do not constitute "securities" for Federal income tax purposes, and the remainder of this summary assumes that such claims do not constitute securities.

Since each holder of an Unsecured Claim will receive, Cash in an approximate amount of between 11% and 18% of its allowed claim, there should be a loss attributable to the holder's tax basis.

Holders of Claims for unpaid employee compensation (assuming such holders are cash-method taxpayers) will be required to treat all amounts received in respect of such Claims as ordinary compensation income at the time such amount is paid (including any amount withheld in respect of employment taxes).

There are no holders of subordinated claims in this case and Interest holders are required to recognize loss equal to the reduction in the tax basis of their Interests.

## XII.
## POSTCONFIRMATION

Prior to the Effective Date, Debtor's Bankruptcy Counsel will prosecute all objections, if any, to Priority and Administrative Claims. From and after the Effective Date, Committee Counsel will prosecute all objections to Unsecured Claims. The Committee will

continue in existence until the final distribution to Claimants under the Plan.

## XIII.
## EFFECT OF CONFIRMATION

The Distributions and other treatment afforded to all holders of Claims and Interests under the Plan shall be in full and complete satisfaction of all Claims against and Interests in the Debtor.

Upon receipt by the Disbursing Agent of the Deposit under the Plan, except for the Exclusions to Releases:

  **a. the Released Parties shall be deemed to have exchanged mutual general releases of all Claims by and among them, and**

  **b. all creditors, interest holders and other parties in interest in this Case shall be deemed to have granted a complete release, waiver and discharge of the Released Parties with respect to all claims, causes of action, rights and liabilities addressed and released by the Plan;**

provided, however, that the Equity Holders shall not be deemed released until the Final Distribution Date.

Except as otherwise expressly provided in the Plan, as of the Effective Date, the Released Parties shall be released and discharged from, and the Confirmation Order shall operate as an injunction against, among other things, the commencement or continuation of any action or the employment of process to collect, offset or recover against any of said entities or their estates, any Claim that arose or was incurred before the Confirmation Date, or from any conduct, act or omission, in connection with or related to the Plan, this Disclosure Statement, or in connection with the Debtor's Case prior to the Confirmation Date. For a more complete description of the injunctions and releases in the Plan, see Article IX of the Plan.

## XIV.
## ANTICIPATED CONFIRMATION DATE

It is anticipated that the Confirmation of the Plan will occur in or about December 8, 2010 and the Consummation Date will be on or before May 30, 2011. The Consummation Date is the date on which payments to Allowed Claims under the Plan shall commence.

## XV.
## <u>CONCLUSION</u>

The Debtor believes that confirmation of the Plan is in the best interests of the Debtor, its creditors and the estate in that the Plan provides for a Distribution to Creditors that they would not otherwise receive.

Dated:  New York, New York
       December 4, 2010

**YL WEST 87TH STREET**

By: <u>/s/Julian Weldon</u>
      Julian Weldon, a director of
      Garrison Residential Funding II LLC
      The sole member of the Debtor